IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| MICHAEL WEARRY,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>SCOTT M. PERRILLOUX, in his Individual Capacity and in his Official Capacity as District Attorney for the 21st Judicial District of Louisiana, and MARLON KEARNEY FOSTER, in his Individual Capacity,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Michael Wearry brings this civil action for actual and punitive damages against Defendant Scott M. Perrilloux, in his individual and official capacities, and against Defendant Marlon Kearney Foster (hereinafter "Kearney Foster" or "Foster") in his individual capacity, alleging that Defendants knowingly and deliberately fabricated the account of an adolescent witness who falsely implicated Wearry in a homicide investigation. This fabrication caused Wearry to be convicted of first degree murder, sentenced to death, and incarcerated on Death Row at the Louisiana State Penitentiary at Angola, Louisiana.

Thus, Wearry brings this lawsuit against Perrilloux and Foster under 42 U.S.C. §§ 1983 and 1988 for violations of his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. These claims are based on Defendants' coercion of a witness to falsely implicate Wearry in the homicide of Eric Walber, and the knowing fabrication of the false information regarding Wearry that resulted in Wearry's 2002 conviction and death sentence.

## PARTIES

1. Michael Wearry is a Louisiana resident. He is currently incarcerated at Livingston Parish Detention Center located in Livingston, LA.

2. Defendant Marlon Kearney Foster is a former Livingston Parish Sheriff's Office Detective. Upon information and belief, Foster is a Louisiana resident who lives in Springfield, LA. He is sued in his individual capacity.

3. Defendant Scott M. Perrilloux is and, at all times relevant to this complaint, was the District Attorney for the 21st Judicial District of Louisiana. In this position, Defendant Perrilloux was and is the final policy-maker for the Office of the District Attorney for the 21st Judicial District.

4. Defendant Perrilloux is sued in his individual and official capacities. He may be served at his office address in Livingston, LA.

## JURISDICTION AND VENUE

5. The Court has subject-matter jurisdiction because this matter arises under the Constitution and laws of the United States. *See* U.S. Const. amend. XIV; 28 U.S.C. § 1331; 42 U.S.C. § 1983. The Court has supplemental jurisdiction over Wearry's related state-law claim for malicious prosecution. *See* 28 U.S.C. § 1367.

6. Venue in the Middle District of Louisiana is appropriate because Foster resides in the Middle District of Louisiana, 28 U.S.C. § 1391(b)(1) and (c)(1); Perrilloux, in his official capacity, is subject to the personal jurisdiction in the Middle District of Louisiana with respect to the claims raised in this complaint, 28 U.S.C. § 1391(b)(1) and (c)(2); and Perrilloux and Foster violated Wearry's due process rights in the Middle District of Louisiana, 28 U.S.C. § 1391(b)(2).

## FACTS RELEVANT TO ALL CLAIMS

    **A.    Michael Wearry Was Not Implicated in the Initial Investigation into the Death of Eric Walber.**

7.    Eric Walber was killed on the evening of April 4, 1998, in Tangipahoa Parish.

8.    In late April 1998, 10-year-old Jeffery Ashton reportedly saw Walber's car on television and told a classmate at Springfield Elementary that he had seen the car before. Ashton's classmate relayed that information to Ashton's teacher, and his teacher called the Tangipahoa Parish Sheriff's Office.

9.    Ashton was interviewed by deputies of the Tangipahoa Parish Sheriff's Office on or about April 30, 1998. Ashton stated that his classmate claimed to have seen an altercation between "the pizza man" and some Black men. This interview was memorialized in a Supplemental Report of the Tangipahoa Parish Sheriff's Office dated April 30, 1998.

10.    On the evening of April 4, 1998, Michael Wearry was at a wedding reception in Baton Rouge.

11.    No physical evidence connected Michael Wearry to Eric Walber's murder.

12.    Michael Wearry was in Oakland, California, where his father lived, in June of 1998. He was held on a parole violation in California and returned to Louisiana.

13.    On his return to Louisiana, Michael Wearry was questioned about his whereabouts on the date of Eric Walber's death. On or about June 17, 1998, law enforcement officials reported to the media that Wearry had an alibi and did not appear to be a suspect in the murder.

### B. Two Years After Walber's Murder, an Unreliable Informant Provides Defendants Perrilloux and Foster with Suspects in the Unsolved Case.

14. Two years after the murder of Eric Walber, the crime remained unsolved. The lack of prosecution and seemingly-stalled investigation had garnered national media attention.

15. In April 2000, an incarcerated man named Sam Scott claimed to have information implicating Michael Wearry in the death of Eric Walber.

16. Michael Wearry was charged with the murder of Eric Walber in June 2000.

17. Scott changed his account of the crime over the course of four later statements, each of which differed from the others in material ways.

### C. Knowing the Weakness of Their Case, Defendants Perrilloux and Foster Falsify Evidence and Coerce Jeffery Ashton to Bear False Witness Against Michael Wearry.

18. Perrilloux's and Foster's efforts to tie Wearry to the murder were based almost exclusively on Scott's account, which contradicted several known facts of the crime.

19. Perrilloux and Foster were concerned that Scott's account would not be sufficient to secure a conviction and death sentence against Wearry.

20. Perrilloux and Foster made an intentional and deliberate decision to fabricate a narrative that would corroborate Scott in order to procure Wearry's conviction and death sentence.

21. In December 2001, Defendant Foster pulled Ashton out of school without his mother's permission and brought Ashton to Perrilloux's office to talk about the case.

22. Ashton was given no opportunity to leave Perrilloux's office.

23. Ashton was subject to juvenile court proceedings at the time and was vulnerable to intimidation by authorities such as Perrilloux and Foster.

4

24. At the District Attorney's Office, Perrilloux and Foster met with Ashton and provided the adolescent with a completely fabricated story to adopt and repeat, implicating Wearry in Walber's murder.

25. The elements of this fabricated narrative were: Ashton had gone to a "musician appreciation" at his church on the night of Walber's murder; he walked home alone; while he was walking home he heard footsteps, so he ran and hid under his house; and he watched Wearry throw Walber's cologne bottle into a ditch and get into Walber's car.

26. None of the purported facts in the above narrative are true. Jeffery Ashton did not see any of the things set forth in this narrative, and they did not, in fact, happen.

27. This was the first of several instances that Foster brought Ashton to Perrilloux's office to feed Ashton parts of a false story about Walber's murder.

28. During one of these rehearsal sessions, Perrilloux and Foster showed Ashton a nine-person photo array. Ashton recognized many of the people on the array, but not Wearry. Perrilloux and Foster pointed out Wearry on the array and asked Ashton if he recognized Wearry. Ashton told them that he did not, but Foster and Perrilloux included Wearry among the group of people that Ashton identified anyway.

29. Ashton never provided firsthand information to Foster or Perrilloux about Wearry, because he had no personal knowledge connecting Wearry to Walber's death.

30. Each time Foster talked to Ashton about the case, he would tell Ashton "this is what you said before," and then would relate details about the night of Walber's murder that Ashton had never actually provided. Ashton would just say "okay," because he was scared of what Foster and Perrilloux might do to him or his family if he did not comply.

31. During one session, and as part of his efforts at coercion and intimidation, Foster brought Ashton to view Walber's car, which still had blood on it, traumatizing Ashton.

32. On information and belief, before each instance of Foster and/or Perrilloux meeting with Ashton, Foster met with Perrilloux to prepare for the meeting, and Perrilloux approved the continued falsification of Ashton's purported witness account.

33. On information and belief, after each instance of Foster and/or Perrilloux meeting with Ashton, Foster and Perrilloux met to debrief and/or report on the meeting, and Perrilloux ratified the continued falsification of Ashton's purported witness account.

34. Perrilloux and Foster coached Ashton in at least six separate meetings to perfect the falsified story.

35. Ashton acquiesced to their demand that he falsely implicate Wearry because they had intimidated and scared him.

### D. Defendant Perrilloux Employs Ashton's False Evidence to Secure the Conviction of Michael Wearry.

36. In March 2002, Perrilloux and his team of prosecutors tried Wearry for Walber's murder.

37. The prosecution called several witnesses, including then-14-year-old Ashton.

38. Ashton testified as Foster and Perrilloux had instructed: he had gone to a "musician appreciation" at his church on April 4, 1998; he walked home alone at 11:20 p.m.; and while he was walking home he heard footsteps, ran and hid under his house, and watched Wearry throw Walber's cologne bottle into a ditch and get into Walber's car.

39. In closing arguments, one of Perrilloux's assistant prosecutors referenced Ashton's falsified testimony and asserted the jury could rely upon this testimony as crucial corroboration of other witnesses.

6

40. The jury convicted Wearry of first degree murder and sentenced him to death.

41. The Louisiana Supreme Court affirmed Wearry's conviction and sentence on direct appeal.

### E. Michael Wearry's Conviction is Vacated by the United States Supreme Court.

42. After his conviction became final, and while he sat on death row, Wearry discovered that Perrilloux and his team of prosecutors withheld evidence unrelated to Ashton that severely undermined the credibility of the snitch testimony at trial.

43. Based on this withheld evidence, Wearry brought a post-conviction motion, alleging violations of his Fourteenth Amendment due process rights.

44. The District Court for the 21st Judicial District of Louisiana denied post-conviction relief. The Louisiana Supreme Court affirmed the denial of post-conviction relief.

45. On March 7, 2016, the United States Supreme Court granted Wearry's petition for a writ of certiorari, reversed the judgment of the post-conviction court, vacated Wearry's conviction, and remanded the case for further proceedings. *Wearry v. Cain*, 136 S. Ct. 1002 (2016).

46. The Supreme Court held that the prosecution's failure to disclose material evidence violated Wearry's due process rights.

47. In vacating Wearry's conviction, the Supreme Court described the case against Wearry as a "house of cards."

### F. Defendant Perrilloux Ratifies the Decision to Falsify Evidence Against Wearry Through the Intimidation of Jeffery Ashton

48. After the Supreme Court vacated Wearry's conviction, and Perrilloux decided to try Wearry again, the intimidation of Ashton to maintain his fabricated account resumed.

49. On September 28, 2016, Livingston Parish Sheriff's Office deputies arrested Ashton for probation violations and brought him to the Livingston Parish Jail.

7

50. While in custody at the Livingston Parish Jail, Lieutenant Ben Ballard of the Livingston Parish Sheriff's Office talked to Ashton about testifying at Wearry's new trial.

51. Over the next few months, the State moved Ashton from jail to jail. Upon information and belief, Ashton's relocation was an attempt to prevent Wearry's defense team from locating or speaking to him.

52. Ballard occasionally met with Ashton in October and November 2016 to coerce Ashton into perpetuating his false testimony. Ballard promised Ashton favors in exchange for favorable trial testimony, stating "You help us and we'll help you."

53. Ballard told Ashton that there is a "special code" that Ballard could use to get Ashton out of jail if he testifies at Wearry's re-trial. Ballard told Ashton, "we might need you to take the stand."

54. Ballard also warned Ashton against speaking to Wearry's defense team. He told Ashton that if Wearry's defense team tried to contact Ashton, "Don't tell them nothing, call me."

55. Upon information and belief, Ballard acted on behalf of or under the instructions of Perrilloux. On information and belief, Perrilloux was notified before each instance of Ballard meeting with Ashton, and Perrilloux approved the continued falsification of Ashton's purported witness account.

56. On information and belief, Perrilloux was notified after each instance of Ballard meeting with Ashton, and Perrilloux ratified the continued falsification of Ashton's purported witness account.

### G. Wearry Discovers the Defendants' Falsification of Ashton's Evidence.

57. In preparations for his re-trial, Wearry's defense team located and interviewed Ashton. On May 31, 2017, Ashton told Wearry's lawyers about the falsification of his witness accounts related to Walber's death.

58. On June 15, 2017, then-29-year-old Ashton signed an affidavit admitting that his testimony at Wearry's 2002 trial was false.

59. Ashton stated in his affidavit that he did not see Wearry the night of Walber's murder. In fact, he had not seen Wearry until he was shown a picture of Wearry by Foster more than two years after the murder occurred.

60. Ashton explained that on the night of Walber's murder, he did not walk home alone from church at 11:20 p.m., he did not see Wearry throw a cologne bottle into a ditch, and he did not see Wearry get into Walber's car.

61. Instead, on the night of Walber's murder, Ashton attended the Ponchatoula Strawberry Festival with his older sister, and later spent the night at her house in Hammond.

62. Ashton stated that his testimony during Wearry's 2002 trial was entirely invented by Perrilloux and Foster.

### H. In Open Court, Ashton Testifies and Confirms the Falsification of Evidence Against Wearry.

63. On November 20, 2017, Ashton testified under oath at an evidentiary hearing.

64. Ashton confirmed in his sworn testimony, in open court in November 2017, that Foster had picked him up from school, driven him to Perrilloux's office, and then, without a parent present, Foster and Perrilloux intimidated him into falsely implicating Wearry in the Walber murder.

65. At the November 2017 hearing, Ashton testified that at the time he was afraid of what might happen to him if he did not comply with Foster and Perrilloux's demands. Ashton further testified that Foster had escorted him to the Wearry trial to ensure he would present the false story concocted by Foster and Perrilloux when he took the stand.

9

# COUNT I

## Fabrication of False Evidence During Investigation
## Fourteenth Amendment Due Process Violation

### (Perrilloux in his Official and Individual Capacities; Foster)

66. All previous paragraphs are re-alleged and incorporated herein by reference.

67. Defendant Perrilloux, in his official and individual capacities, and Defendant Foster, in his individual capacity, fabricated evidence which they knew was false in the investigation of Eric Walber's murder, violating Plaintiff Wearry's right to due process of law guaranteed by the Fourteenth Amendment.

68. At all times relevant to this Count, Perrilloux acted under color of state law in his official capacity as the final policy-maker for the Office of the District Attorney for the 21st Judicial District of Louisiana.

69. At all times relevant, Perrilloux acted under color of state law in his individual capacity as the State of Louisiana's 21st Judicial District Attorney.

70. At all times relevant from 1998 until 2010, Foster acted under color of state law in his individual capacity as the Livingston Parish Sheriff's Office Chief of Detectives.

71. During the investigation of Walber's murder, Perrilloux and Foster intentionally and deliberately coerced and intimidated Ashton, a minor, into fabricating false evidence implicating Wearry in the Walber murder.

72. Perrilloux and Foster knew that the story they provided to Ashton was false. Defendants made an intentional and deliberate decision to fabricate a false account, intimidate Ashton into adopting that account, and then continued to intimidate and coerce Ashton to maintain that account.

73. Perrilloux's and Foster's conduct in manufacturing and perpetuating Ashton's false witness account violated Wearry's due process rights.

74. Because Perrilloux, acting in his official capacity as District Attorney and final policy-maker for the Office of the District Attorney for the 21st Judicial District of Louisiana, intentionally and deliberately caused the fabrication of witness accounts in the process of investigating the homicide of Eric Walber, he is liable in his official capacity as District Attorney.

75. Perrilloux is also liable in his individual capacity for his intentional acts in causing a witness to provide a fabricated account implicating Wearry in the murder of Eric Walber.

76. Because Wearry sues Perrilloux in his official capacity, prosecutorial immunity does not shield Perrilloux from liability as District Attorney of the 21st Judicial District of Louisiana.

77. Because Wearry sues Perrilloux in his individual capacity for the falsification of evidence during an investigation, prosecutorial immunity does not shield Perrilloux from liability.

78. Wearry's due process right not to be the subject of falsification of evidence in an investigation of a homicide was clearly established at the time Perrilloux and Foster violated that right. Thus, qualified immunity does not shield Perrilloux or Foster from liability.

79. Foster and Perrilloux knew that intimidating an adolescent witness into falsifying a witness account fabricated by Perrilloux and Foster violated Wearry's due process rights.

80. Perrilloux's and Foster's violation of Wearry's due process rights by falsification of evidence caused Wearry to suffer significant damages, including but not limited to his wrongful conviction and death sentence, and his incarceration on death row for almost 15 years.

81. As a result of Foster and Perrilloux's violation of his constitutional rights, Wearry is entitled to damages in an amount to be determined at trial in addition to his reasonable attorneys' fees and costs.

82. Perrilloux and Foster's falsification of evidence was intentional. In falsifying evidence against Wearry, Perrilloux and Foster acted with the intent to violate Wearry's Federal constitutional rights to due process of law. Therefore, punitive damages should be awarded against Perrilloux in his individual capacity and Foster in his individual capacity.

## COUNT II

### Intentional Use of Perjured Testimony
### Fourteenth Amendment Due Process Violation

### (Perrilloux in Official Capacity Only)

83. All previous paragraphs are re-alleged and incorporated herein by reference.

84. Defendant Perrilloux, in his official capacity as District Attorney for the 21st Judicial District of Louisiana, directed that evidence known to Defendant Perrilloux as false be presented at the trial of Plaintiff Michael Wearry for First Degree Murder, violating Plaintiff Wearry's right to due process of law guaranteed by the Fourteenth Amendment.

85. At all times relevant to this Count, Perrilloux acted under color of state law in his official capacity as the final policy-maker for the Office of the District Attorney for the 21st Judicial District of Louisiana.

86. Defendant Perrilloux, as final policy-maker for the Office of the District Attorney for the 21st Judicial District of Louisiana, made an intentional, deliberate decision to call Ashton as a witness at trial and to elicit the testimony manufactured by Perrilloux and Foster.

87. Perrilloux knew, before Wearry's trial, that the testimony to be elicited from Ashton would be false.

88. Ashton testified at Wearry's trial, and gave false evidence against Wearry consistent with the fabrications invented by Perrilloux and Foster during the homicide investigation.

89. Although Perrilloux knew that Ashton's testimony was false, Perrilloux did not advise the Court, the jury, or Wearry that false testimony had been given at the trial.

90. In closing arguments, one of Perrilloux's assistant prosecutors referenced Ashton's falsified testimony and asserted the jury could rely upon this testimony as crucial corroboration of other witnesses.

91. The jury convicted Wearry of first degree murder and sentenced him to death.

92. The knowing presentation of false testimony by Perrilloux, acting in his official capacity, was a moving force causing Wearry to be convicted of first degree murder, sentenced to death, and serve 15 years on death row.

93. The manufacturing of evidence and knowing use of that evidence, along with perjured testimony to obtain a wrongful conviction, deprives a defendant of his long recognized right to a fair trial secured by the Fourteenth Amendment's Due Process Clause.

94. Because Wearry sues Perrilloux in his official capacity for the knowing presentation of false evidence at trial, prosecutorial immunity does not shield Perrilloux from liability in his official capacity as District Attorney of the 21st Judicial District of Louisiana.

95. Because Wearry sues Perrilloux in his official capacity for the knowing presentation of false evidence at trial, qualified immunity does not shield Perrilloux from liability in his official capacity as District Attorney of the 21st Judicial District of Louisiana.

96. As a result of Perrilloux's violation of his constitutional rights, Wearry is entitled to damages against Perrilloux, in his official capacity, in an amount to be determined at trial in addition to his reasonable attorneys' fees and costs.

## COUNT III

### Supplemental Claim for Malicious Prosecution
### La. Civil Code art. 2315

**(Perrilloux in both capacities and Foster)**

97. All previous paragraphs are re-alleged and incorporated herein by reference.

98. Defendant Perrilloux, in his official and individual capacities, and Defendant Foster, in his individual capacity, are liable to Plaintiff Michael Wearry for malicious prosecution under La. Civil Code art. 2315.

99. Defendants' prosecution of Wearry for the murder of Walber was predicated upon Ashton's witness testimony, which Perrilloux and Foster fabricated through coercion of Ashton.

100. The Supreme Court vacated Wearry's conviction, a termination of the prosecution in Wearry's favor.

101. The fabrication of Ashton's testimony by Perrilloux and Foster demonstrates their knowledge that the true facts of Eric Walber's murder did not supply probable cause to commence and continue Wearry's prosecution.

102. Perrilloux and Foster fabricated evidence against Wearry with malice and a reckless disregard for Wearry's constitutional rights.

103. Wearry is being re-tried for the Walber murder, but the outcome of that re-trial is immaterial to the viability of Wearry's claims in this lawsuit, and the fact that a retrial is pending does not preclude this action.

104. As a result of Foster and Perrilloux's violation of his constitutional rights, Wearry is entitled to damages against all Defendants in an amount to be determined at trial in addition to his reasonable attorneys' fees and costs.

## JURY DEMAND

105. Wearry demands a jury trial on all issues triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Wearry requests that the Court enter an order granting the following relief:

1. Awarding Wearry judgment on his claims in an amount to be determined at trial;

2. Awarding punitive damages in favor of Wearry and against Defendant Perrilloux in his individual capacity and Defendant Foster in his individual capacity, in an amount to be determined at trial;

3. Awarding Wearry his fees and costs, including reasonable attorneys' fees as provided by 42 U.S.C. § 1988; and

4. Granting such other and further relief as the Court deems just and equitable.

DATED:     May 30, 2018.

Respectfully Submitted,

*/s/James W. Craig*
*James W. Craig, Bar No. 33687
Emily M. Washington, Bar No. 34143
Eric A. Foley, Bar No. 34199

Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)

jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org
eric.foley@macarthurjustice.org

*Attorneys for Plaintiff*

*Lead Counsel