**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

MICHAEL WEARRY

CIVIL ACTION

VERSUS

18-594-SDD-RLB

SCOTT M. PERRILLOUX and
MARLON KEARNEY FOSTER

<u>RULING</u>

Before the Court is the *Motion to Dismiss, Purusant [sic] to FRCP Rule 12(b)(6),*
*For Failure to State a Claim Upon Which Relief Can Be Granted*[1] filed by Defendant, Scott
M. Perrilloux ("Perrilloux"), District Attorney for the 21st Judicial District of Louisiana.
Plaintiff Michael Wearry ("Wearry") has filed a *Memorandum in Opposition.*[2] Perrilloux
also filed a *Supplemental Memo in Support of Motion to Dismiss.*[3] For the reasons that
follow, the Court finds that the *Motion* should be denied.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

This case arises out of the 1998 murder of Albany High School student Eric
Walber. Plaintiff Michael Wearry was questioned during the initial homicide investigation,
but in June 1998, law enforcement officials told the media that Wearry had an alibi and
was not considered a suspect in the murder.[4] The case remained stubbornly unsolved
and became the subject of national media attention. Then, in 2000, "an incarcerated man
named Sam Scott"[5] came forward and implicated Michael Wearry in the crime. In 2002,

---

[1] Rec. Doc. No. 14.
[2] Rec. Doc. No. 16.
[3] Rec. Doc. No. 43.
[4] Rec. Doc. No. 1, p. 3, ¶ 13.
[5] Rec. Doc. No. 1, p. 4, ¶ 15.
50910

a jury in Livingston Parish, Louisiana convicted Wearry of first-degree murder and sentenced him to death.[6] Wearry appealed his conviction to the Louisiana Supreme Court, which found no merit in any of the 38 assignments of error presented and affirmed Wearry's conviction and sentence.[7]

Later, Wearry's defense counsel became aware of certain "belatedly revealed information [that] would have undermined the prosecution and materially aided Wearry's defense at trial."[8] In 2016, after Wearry's attempts to obtain postconviction relief at the state level were unsuccessful, the United States Supreme Court granted the petition for writ of certiorari that Wearry filed from Death Row at the Louisiana State Penitentiary. Calling the state's evidence against Wearry a "house of cards"[9] and finding that "the prosecution's failure to disclose material evidence violated Wearry's due process rights,"[10] the Supreme Court vacated Wearry's conviction and remanded the case for a new trial.

On May 30, 2018, while awaiting his new trial, Michael Wearry filed this lawsuit against Scott M. Perrilloux, who was the District Attorney in the 21st Judicial District of Louisiana for Livingston Parish when Wearry was convicted. In his *Complaint*, Wearry alleges that Perrilloux secured his conviction by "knowingly and deliberately fabricat[ing] the account of an adolescent witness who falsely implicated [him]."[11] More specifically, Wearry alleges that Perrilloux was "concerned" that the testimony of the inmate who came

---

[6] Rec. Doc. No. 1, p. 7, ¶ 40.
[7] *State v. Weary* [sic], 2003-3067 (La. 4/24/06), 931 So. 2d 297.
[8] *Wearry v. Cain*, 136 S. Ct. 1002, 1004 (2016).
[9] *Id.* at 1006.
[10] *Id.* at 1002.
[11] Rec. Doc. No. 1, p. 1.
50910

forward "would not be sufficient to secure a conviction and death sentence against Wearry," so he did the following:[12]

1) "made an intentional and deliberate decision to fabricate a narrative . . . in order to procure Wearry's conviction and death sentence"[13];

2) Identified Jeffery Ashton, a minor who was "subject to juvenile court proceedings at the time and was vulnerable to intimidation by authorities,"[14] "picked him up from school, [drove] him to Perrilloux's office, and then, without a parent present . . . intimidated him"[15] and "provided [him] with a completely fabricated story to adopt and repeat"[16] that implicated Wearry in the murder;

3) Included Wearry on a list of people Ashton identified from a photo array even though "Ashton told them he did not"[17] recognize Wearry and, in fact, "had no personal knowledge connecting Wearry to Walber's death"[18];

4) "[C]oached Ashton in at least six separate meetings to perfect the falsified story";[19]

5) Persuaded Ashton that he had previously provided "details about the night of Walber's murder that Ashton had never actually provided";[20]

6) And, after the Supreme Court vacated Wearry's conviction, allegedly instructed Livingston Parish Sheriff's Deputy Ben Ballard to "coerce Ashton into

---

[12] Rec. Doc. No. 1, p. 4, ¶ 19.
[13] Rec. Doc. No. 1, p. 4.
[14] Rec. Doc. No. 1, p. 4.
[15] Rec. Doc. No. 1, p. 9.
[16] *Id.* at p. 5.
[17] *Id.*
[18] *Id.*
[19] *Id.* at p. 6.
[20] Rec. Doc. No. 1, p. 5.
50910

perpetuating his false testimony,"[21] including "promis[ing] favors in exchange for favorable trial testimony"[22] at the new trial.

Based on these allegations, Wearry brings two claims under 42 U.S.C. § 1983, arising out of Perrilloux's alleged "fabrication of false evidence"[23] and "intentional use of perjured testimony."[24] Additionally, Wearry brings a malicious prosecution claim under Louisiana Civil Code article 2315. On these three counts, Wearry prays for an award of damages, including punitive damages, fees, and costs.

Now, Perrilloux asks this Court to dismiss the official capacity claims against him for two reasons: first, because Wearry "makes no allegations of an official custom or policy"[25] in support of his 42 U.S.C. § 1983 claims, as required by the relevant jurisprudence;[26] and second, because Perrilloux argues he is entitled to absolute prosecutorial immunity with respect to the state law claim for malicious prosecution.

## II.   LAW AND ANALYSIS

### A.  Rule 12(b)(6) Motion to Dismiss

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[27] The Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[28] "To

---

[21] *Id.* at p. 8.
[22] *Id.*
[23] Rec. Doc. No. 1, p. 10.
[24] Rec. Doc. No. 1, p. 12.
[25] Rec. Doc. No. 14-1, p. 8.
[26] *Infra* p. 7 *et. seq.*
[27] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007)(quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir. 2004)).
[28] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).
50910

survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[29] In *Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[30] A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[31] However, "[a] claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[32] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that the defendant has acted unlawfully."[33] "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[34]  On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."[35]

---

[29] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d at 467).
[30] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(internal citations and brackets omitted)(hereinafter *Twombly*).
[31] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)(internal citations omitted)(hereinafter "*Iqbal*").
[32] *Twombly*, 550 U.S. at 570.
[33] *Iqbal*, 556 U.S. at 678.
[34] *Taha v. William Marsh Rice University*, 2012 WL 1576099 at *2 (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).
[35] *Twombly*, 550 U.S. at 556 (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).
50910

### B. Federal Claims under 42 U.S.C. § 1983

The Civil Rights Act of 1866, 42 U.S.C. § 1983, creates a private right of action for redressing the violation of federal law by those acting under color of state law.[36] It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....[37]

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights conferred elsewhere.'"[38]

To prevail on a Section 1983 claim, a plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States.[39]  A Section 1983 complainant must support his claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations.[40]

### 1. Official Capacity Claims/*Monell* Liability

A suit against a government official in his official capacity is the equivalent of filing

---

[36] *See Migra v. Warren City School District Board of Educ.*, 465 U.S. 75, 82 (1984); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 19 (1981).

[37] 42 U.S.C. § 1983.

[38] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, (1979)); *accord Graham v. Connor*, 490 U.S. 386, 393–94 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985); *Jackson v. City of Atlanta, TX*, 73 F.3d 60, 63 (5th Cir.), *cert. denied*, 519 U.S. 818 (1996); *Young v. City of Killeen*, 775 F.2d 1349, 1352 (5th Cir.1985).

[39] *See Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Daniels v. Williams,* 474 U.S. 327, 330 (1986); *Augustine v. Doe*, 740 F.2d 322, 324–25 (5th Cir.1984).

[40] *See Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir.1995); *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir.), *cert. denied*, 498 U.S. 908 (1990); *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir.1986); *Angel v. City of Fairfield*, 793 F.2d 737, 739 (5th Cir.1986).

50910

suit against the government agency of which the official is an agent.[41] Accordingly, the claims against District Attorney Perrilloux in his official capacity are, in effect, claims against the municipal entity he represents, namely, the Livingston Parish District Attorney's Office.[42]  A plaintiff asserting a Section 1983 claim against a municipal official in his official capacity or a Section 1983 claim against a municipality "must show that the municipality has a policy or custom that caused his injury."[43]  To establish an "official policy," a plaintiff must allege either of the following:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated the policymaking authority; or
2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.[44]

To sustain a claim for municipal liability, the policymaker must have final policymaking authority.[45]  "[W]hether a particular official has final policymaking authority is a question of *state law*."[46]  Moreover, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff" for the necessary determination to be made on the policy's relative constitutionality.[47] Although "a single

---

[41] *Monell v. New York City Dep't of Soc. Serv, of City of New York*, 436 U.S. 658, 691 n. 55 (1978).
[42] *Kentucky v. Graham,* 473 U.S. at 165; *see also Bellard v. Gautreaux*, No. CIV.A. 08-627, 2010 WL 3523051, at *4 (M.D. La. Sept. 3, 2010) amended in part, No. CIV.A. 08-627, 2010 WL 4977480 (M.D. La. Dec. 2, 2010), *affirmed*, 675 F.3d 454 (5th Cir. 2012) *and affirmed*, 675 F.3d 454 (5th Cir. 2012).
[43] *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007).
[44] *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir.1984).
[45] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).
[46] *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotations omitted) (emphasis in original).
[47] *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).
50910

decision may create municipal liability if that decision were made by a final policymaker responsible for that activity,"[48] absent an official policy, actions of officers or employees of a municipality do not render the municipality liable under Section 1983.[49]

### C. Analysis

1. Whether Wearry Stated a § 1983 Claim against Perrilloux in his Official Capacity in Counts One and Two

Perrilloux contends that the Section 1983 claims against him in his official capacity should be dismissed because Wearry fails to allege that Perrilloux's actions were part of a "pattern of similar violations of federal rights."[50] In the absence of such an allegation, Perrilloux argues, Wearry has not stated a claim regarding the existence of an "official policy" that is capable of subjecting Perrilloux to official capacity liability under Section 1983. Perrilloux's rather cursory argument, which consists primarily of extensive block quotes, fails to consider that the Fifth Circuit has approved of more than one way to plead an "official policy" for Section 1983 purposes, only one of which requires a showing of a *pattern* of constitutional violations. Indeed, the Fifth Circuit has also held that a plaintiff can successfully state a Section 1983 claim based on an "official policy" when he alleges the existence of "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated the policymaking authority."[51]

---

[48] *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir.1996) (internal quotations and citations omitted) (emphasis in original).
[49] *Id.*
[50] Rec. Doc. 14-1, p. 8 (quoting *Malone v. City of Fort Worth, Texas*, 297 F.Supp.3d 645 (N.D. Tex. 2018)).
[51] *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir.1984).
50910

To that end, Wearry alleges, and Perrilloux does not dispute, that Perrilloux was the "final policy-maker for the Office of the District Attorney for the 21st Judicial District of Louisiana."[52] Wearry further alleges that Perrilloux's decisions during the investigation and trial were the "moving force"[53] that caused the "violation of Wearry's due process rights by falsification of evidence."[54]

Although it is not disputed that Perrilloux was a policymaker for purposes of the Section 1983 claim, his status as a policymaker does not end the inquiry. To state a Section 1983 claim based on an "official policy," Wearry must allege the existence of a "policy statement, ordinance, regulation, or decision that is officially adopted and promulgated"[55] by the policymaker. Wearry does not allege that Perrilloux's actions were the product of any policy statement, ordinance, or regulation. Instead, he claims that Perrilloux's alleged "intentional and deliberate *decision* to fabricate"[56] evidence was the moving force of the constitutional violation.

The Fifth Circuit has "consistently held ... that '[a]llegations of an isolated incident are not sufficient to show the existence of a custom or policy.'"[57]  This is because "[i]solated violations are not the persistent, often repeated constant violations that constitute custom and policy."[58] However, "a single decision by a policy maker may, under

---

[52] Rec. Doc. No. 1, p. 10, ¶ 68. Moreover, a district attorney's status as a final policymaker for his or her office has been a matter of settled Fifth Circuit law at least since *Burge v. Parish of St. Tammany* (187 F.3d 452, 469 (5th Cir.1999)) was decided in 1999 ("a district attorney is the independent and final official policymaker for all of the administrative and prosecutorial functions of his office").
[53] Rec. Doc. No. 1, p. 13, ¶ 92.
[54] *Id.* at p. 11, ¶ 80.
[55] *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984).
[56] Rec. Doc. No. 1, p. 10, ¶ 72 (emphasis added).
[57] *Mathews v. Bowie Cty., Tex.*, 600 Fed.Appx. 933, 934 (5th Cir. 2015)(citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir.1992)).
[58] *Fraire*, 957 F.2d at 1278 (5th Cir. 1992) (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir.1984), cert. denied, 472 U.S. 1016 (1985)).
50910

certain circumstances, constitute a policy for which [a municipality] may be liable."[59]  Even so, "[t]he single incident exception is a narrow one, and one that [the Fifth Circuit has] been reluctant to expand."[60]

Wearry cites *Bennett v. Pippin*[61] for the proposition that "[a] single unconstitutional act or decision by a local governmental entity's final policymaker can subject that governmental entity to liability under § 1983 if that act or decision is within the sphere of the final policymaker's authority, and the policymaker's action reflects an intentional, deliberate decision."[62] Under that standard, Wearry explains, Perrilloux's decision to fabricate and present false evidence represented the "direct acts and decisions of a final policymaker which were the moving force behind the violation"[63] of his rights.

In *Pembaur v. City of Cincinnati*, the United States Supreme Court considered "whether, and in what circumstances, a decision by municipal policymakers on a single occasion may satisfy"[64] the requirements for successfully pleading *Monell* liability. The Court found that where "[t]he Prosecutor made a considered decision based on his understanding of the law" and "[t]hat decision directly caused the violation of petitioner's [constitutional] rights,"[65] that decision could give rise to liability under Section 1983. Wearry's allegations that Perrilloux "made an intentional and deliberate decision"[66] that

---

[59] *Brown v. Bryan Cty.,* 219 F.3d 450, 462 (5th Cir. 2000).
[60] *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003).
[61] 74 F.3d 578, 586 (5th Cir. 1996).
[62] Rec. Doc. No. 16, p. 5.
[63] Rec. Doc. No. 16, p. 6.
[64] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 471 (1986).
[65] *Id.* at 484.
[66] Rec. Doc. No. 1, p, 10, ¶ 72.
50910

was a "moving force causing Wearry to be convicted of first degree murder"[67] suffice to meet the standard articulated in *Pembaur*.

Likewise, in *Brown v. Bryan County*,[68] the Fifth Circuit addressed the applicability of the single incident exception. Although *Brown* arose out of a claim for failure to train and supervise, the analysis nevertheless informs the instant issue. The *Brown* court noted that as a matter of Supreme Court precedent, "[t]he basis for liability . . . is dependent upon the degree of fault."[69] An "utter failure"[70] to train and supervise was sufficient to give rise to liability. Moreover, "a single incident . . . may serve as a basis for liability so long as that violation was an obvious consequence of the policy."[71] Accepting Wearry's allegations as true, Perrilloux's conduct was arguably both blatant and obviously likely to result in the violation of Wearry's rights. Expressed in terms of the degree of fault, Perrilloux's alleged scheme to fabricate evidence that would secure Wearry's conviction, if proven, could plausibly be described as an "utter failure," not a limited or unintentional violation of Wearry's rights.

At the motion to dismiss stage, this Court finds that the instant allegations may present an example of the "rare circumstances"[72] where the single incident exception may apply. Thus, Wearry has successfully pleaded the existence of an official policy and stated a claim against Perrilloux in his official capacity. Therefore, Perrilloux's *Motion to*

---

[67] Rec. Doc. No. 1, p. 13, ¶ 92.
[68] 219 F.3d 450 (5th Cir. 2000).
[69] *Brown v. Bryan Cty., OK*, 219 F.3d 450, 459 (5th Cir. 2000) (citing *City of Canton*).
[70] *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 386 (5th Cir. 2005).
[71] *Brown v. Bryan Cty., OK*, 219 F.3d 450, 460 (5th Cir. 2000).
[72] *Howell v. Town of Ball*, 827 F.3d 515, 527 (5th Cir. 2016).
50910

*Dismiss* is DENIED with respect to the Section 1983 claims against Perrilloux in his official capacity, namely, Counts One and Two in the *Complaint*.

    2.  <u>Whether Perrilloux is Entitled to Absolute Immunity for Wearry's State Law Malicious Prosecution Claim</u>

In his *Motion to Dismiss*, Perrilloux argues that he is entitled to absolute prosecutorial immunity for the malicious prosecution claim that Wearry brings under Louisiana law. Wearry disagrees, offering several counterarguments. First, Wearry contends that absolute immunity is only available as a defense to individual capacity claims; thus, absolute immunity cannot shield Perrilloux from liability in his official capacity. Second, Wearry argues that absolute immunity does not attach because Perrilloux's conduct – specifically, his alleged use of intimidation and coercion to fabricate evidence for use at Wearry's trial – is outside the scope of conduct for which prosecutors can be absolutely immune. The Court will address these arguments in turn.

*i.  Absolute Immunity in the Context of Official Capacity Claims*

Perrilloux seeks to assert absolute immunity with respect to Wearry's "Supplemental Claim for Malicious Prosecution," which is brought against Perrilloux in both his official and individual capacities.[73] Wearry argues that the defense of absolute immunity is not available to Perrilloux in his official capacity, citing *Kentucky v. Graham*,[74] wherein the United States Supreme Court held that "[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."[75] In an official capacity action,

---

[73] Rec. Doc. No. 1, p. 14, Count III.
[74] 473 U.S. 159 (1985).
[75] *Id.* at 167.
50910

the Court clarified, "personal immunity defenses"[76] are unavailable. But the claim at issue in *Kentucky v. Graham* was brought under Section 1983; here, the question is whether absolute immunity can shield Perrilloux in the context of an official-capacity *state law* claim for malicious prosecution. The Court finds that, as a matter of law in the Fifth Circuit, absolute immunity applies coextensively to state and federal law claims against prosecutors. In *Burge v. Parish of St. Tammany,*[77] the Fifth Circuit considered whether absolute immunity barred certain state law claims against a prosecutor and concluded: "The rule in this circuit is that a Louisiana district attorney, sued in his or her official capacity, is a local government official who is not entitled to Eleventh Amendment immunity."[78] Thus, the Court agrees with Wearry that the defense of absolute immunity is not available to Perrilloux with respect to the official capacity claims against him. The *Motion to Dismiss* is hereby denied with respect to the malicious prosecution claim against Perrilloux in his official capacity.

*ii. The Scope of Absolute Immunity*

Although absolute immunity is unavailable as a matter of law with respect to the malicious prosecution claim against Perrilloux in his official capacity, it could still shield him from liability in his individual capacity. The question before the Court is whether the allegations against Perrilloux fall within the broad scope of conduct that courts have held to be protected by absolute prosecutorial immunity.

In *Knapper v. Connick*, the Louisiana Supreme Court held that absolute prosecutorial immunity attaches to "conduct . . . that is intimately associated with the

---

[76] *Id.*

[77] 187 F.3d 452 (5th Cir. 1999).

[78] *Id.* at 466.

50910

conduct of the judicial phase of the criminal process and for a prosecutor's acts in initiating a prosecution and in presenting the state's case."[79] Perrilloux argues here, without elaboration, that his alleged actions in the Wearry case "clearly" fall within that scope.[80] As an initial matter, the Court questions whether the alleged intimidation, coercion, and the fabrication of evidence "clearly" fall within a district attorney's "traditional role[] as [an] advocate[] for the state."[81] Although the breadth of discretion granted to district attorneys under Louisiana law *is* vast,[82] and federal courts in Louisiana have held that prosecutors can be entitled to absolute immunity even when they act "maliciously, wantonly or negligently,"[83] the scope of prosecutorial immunity is not infinite. The Louisiana Supreme Court instructs that "a functional analysis of the role a prosecutor is fulfilling when the alleged misconduct occurs is the touchstone to determining the type of immunity available."[84] If the complained-of conduct arises when the prosecutor is performing "an investigatory, administrative, ministerial, or other role that has no functional tie to the judicial process, only a qualified immunity is afforded."[85]

Per Wearry, his allegations arise out of Perrilloux's fabrication of evidence during the *investigation* into the Walber murder and, as such, are not subject to a defense of absolute prosecutorial immunity.  Courts outside this Circuit have held as much. In *Moore v. Valder,* the D.C. Circuit held that "[i]ntimidating and coercing witnesses into changing

---

[79] *Knapper v. Connick,* 96-0434 (La. 10/15/96), 681 So. 2d 944, 949 (citing *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), and *Burns v. Reed*, 500 U.S. 478 (1991)).
[80] Rec. Doc. No. 14-1, p. 15.
[81] *Knapper* at 946.
[82] See La. Code Crim. P. art. 61 ("Subject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute").
[83] *Morrison v. City of Baton Rouge*, 761 F.2d 242, 248 (5th Cir. 1985)).
[84] 681 So.2d 946.
[85] *Knapper* at 950.

50910

their testimony is not advocatory. It is rather a misuse of *investigative* techniques."[86] Likewise, in *Barbera v. Smith,*[87] the Second Circuit held that "*acquiring* evidence which might be used in a prosecution"[88] – as opposed to the "organization, evaluation, and marshalling"[89] of such evidence – was activity of a "police nature" and was therefore not entitled to absolute immunity. Though these cases are not binding precedent, the Court finds the reasoning persuasive.

Wearry cites additional cases where courts have explicitly held that the fabrication of evidence falls outside the scope of conduct for which prosecutors can be absolutely immune.[90] In *Fields v. Wharrie*,[91] a former prisoner whose murder conviction was vacated sued the prosecutor who convicted him, alleging that he had obtained the conviction by coercing witnesses into giving testimony that he knew to be false. The United States Court of Appeals for the Seventh Circuit considered whether absolute immunity could shield the prosecutor for fabricating evidence against a suspect. The court initially observed that "[p]resenting evidence at trial is a core prosecutorial function, protected by absolute immunity."[92] But, the court went on to find that a prosecutor who fabricates evidence to be used at trial cannot cloak himself in absolute immunity. "A prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial. That would create a 'license to lawless

---

[86] 65 F.3d 189, 194 (D.C. Cir. 1995).
[87] 836 F.2d 96 (2d Cir.1987).
[88] *Id.* at 100.
[89] *Id.*
[90] *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014); *McGhee v. Pottawattamie Cty., Iowa*, 547 F.3d 922 (8th Cir. 2008); *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000).
[91] 740 F.3d 1107 (7th Cir. 2014).
[92] *Id.* at 1111.
50910

conduct,'"[93] the court wrote. Likewise here, allowing Perrilloux to claim absolute immunity simply because his alleged actions can be characterized as "preparation for trial" would create a license for prosecutors to use intimidation to fabricate evidence, knowing they would be shielded by immunity.

Turning to a case within the Fifth Circuit, Wearry argues that Perrilloux is not absolutely immune in light of the relatively cabined scope of prosecutorial immunity offered in *Loupe v. O'Bannon*.[94] There, the Fifth Circuit considered whether absolute immunity could shield a district attorney from a state law malicious prosecution claim alleging that he ordered a sheriff's deputy to make a warrantless arrest without probable cause. The Fifth Circuit concluded that ordering a warrantless arrest "was not part of [her] prosecutorial function."[95]

Wearry characterizes the *Loupe* court as holding that "a prosecutor was not absolutely immune to a malicious prosecution claim under Louisiana law when ordering a sheriff's deputy to make a warrantless arrest."[96]  However, this Court notes that the Fifth Circuit in *Loupe* actually *affirmed* the district court's dismissal of the malicious prosecution claim on absolute immunity grounds, but held that the district attorney was not absolutely immune with respect to the other federal and state law claims asserted by the plaintiff (Section 1983 and "defamation, false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress"). Although the basis for the Fifth Circuit's decision to distinguish between the applicability of absolute immunity for the state

---

[93] Id. at 1114 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).
[94] 824 F.3d 534 (5th Cir. 2016).
[95] *Id.* at 540.
[96] Rec. Doc. No. 16, pp. 5-6.
50910

law malicious prosecution claim and the federal law Section 1983 claims is not completely clear, *Loupe* provides limited, if any, support for Wearry's argument that absolute immunity does not apply to the state law claim here.

Perrilloux urges the Court to recognize a temporal distinction in the facts of the instant case -- because his alleged fabrication of evidence occurred "only **after** plaintiff had been arrested and indicted for the murder of Eric Walber,"[97] he argues, it cannot have been *investigatory* in the sense of developing probable cause to charge a suspect. Because the alleged coercion and fabrication occurred after Wearry was already charged, he contends that those actions amounted to "pursuing a criminal prosecution," for which he was absolutely immune. Perrilloux cites *Beckett v. Ford*,[98] a Sixth Circuit case, for the proposition that coercion of a witness, even rising to the level of fabrication of evidence, is ultimately classified as a prosecutorial function. The *Beckett* court wrote:

> even if [the prosecutor] threatened, coerced, or enticed [the witness] into presenting false testimony, [he] did so as part of his effort to prosecute [the plaintiff] for [the] murder. In other words, despite [the plaintiff's] assertion that any fabrication of evidence "occurred during the investigatory phase of [his] ordeal," and despite [the plaintiff's] assertion that [the prosecutor] was engaged in investigation . . . [the prosecutor] was acting neither as an investigator nor an administrator when he reviewed with [the witness] what [he] would say on the stand.[99]

*Beckett* is distinguishable from the instant case insofar as it was decided in a summary judgment posture, with the Sixth Circuit's conclusion coming as a result of the evidence in the record. In other words, *Beckett* cannot be read as a universal statement that, as a matter of law, prosecutors who coerce witnesses into false testimony are fulfilling a

---

[97] Rec. Doc. No. 39-1, p. 1 (emphasis original).
[98] 384 F. App'x 435 (6th Cir. 2010).
[99] *Id.* at 451.
50910

prosecutorial function for which they are entitled to absolute immunity. In fact, the *Beckett* court specifically stopped short of making a categorical determination on the subject, noting that "while it is possible for a prosecutor who engages in a conspiracy to manufacture false evidence not to be acting as an advocate for the state when he does so, *in this case* [the prosecutor] was acting as an advocate for the state."[100]

*Beckett* can also be distinguished with respect to the extent of the alleged coercion and fabrication. The Sixth Circuit concluded that the conduct the prosecutor engaged in was advocatory when he "went to the prison to determine whether [the witness] and [the plaintiff] had been in sufficient proximity to permit [the plaintiff] to confess to [the witness],"[101] then "reviewed with [the witness] what [he] would say on the stand"[102] and "fail[ed] to correct [the witness' allegedly false] testimony"[103] when it was offered in court. Wearry's allegations here – of a coercive and meticulously planned scheme to fabricate eyewitness testimony -- strike this Court as fundamentally different in character than the conduct that, in the eyes of the Sixth Circuit in *Beckett*, fell within the scope of the prosecutor's role as an advocate for the state. At the end of the day, the *Beckett* court found "no evidence at all that [the prosecutor] fabricated evidence or encouraged [the witness] to lie."[104] Here, at the motion to dismiss stage, it is too early to say what the evidence will bear out. The Court finds that Wearry has stated a plausible claim that Perrilloux's actions exceeded the bounds of conduct for which a prosecutor is absolutely immune.

---

[100] *Id.* (emphasis added).
[101] *Id.* at 441.
[102] *Id.* at 451.
[103] *Id.*
[104] *Id.*

50910

It is true, however, that the United States Supreme Court has generally recognized that the preparation of witnesses for trial is a prosecutorial function. In *Imbler v. Pachtman*, the Court held that an out-of-court "effort to control the presentation of [a] witness' testimony"[105] was entitled to absolute immunity because it was "fairly within [the prosecutor's] function as an advocate."[106] The facts of *Imbler* are readily distinguishable from the instant allegations, however. The actions of the prosecutor in *Imbler* were as follows: *during a courtroom recess*, the prosecutor asked the police to refrain from questioning his witness about a bad-check charge pending against the witness until his testimony was complete. The plaintiff asserted that the prosecutor's "request was an investigative activity because it was a direction to police officers engaged in the investigation of crime."[107] On those facts, the *Imbler* Court called the prosecutor's action an "effort to control the presentation of [a] witness' testimony"[108] to which absolute immunity would attach. By contrast, Wearry alleges that Perrilloux *created* a witness' testimony wholesale and used coercion and intimidation to force that witness to offer it at trial. Such conduct is not, as the *Imbler* Court called it, "fairly within [the prosecutor's function as an advocate],"[109] especially in light of the public policy principles underpinning the doctrine of absolute prosecutorial immunity.

The *Imbler* Court noted that the doctrine exists to preserve the independence of prosecutors and shield them from concern over litigation that may bring to light certain

---

[105] *Imbler v. Pachtman*, 424 U.S. 409, 430 n. 32 (1976).
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*
50910

actions undertaken even by the "honest prosecutor,"[110] such as the "prosecutor's possible knowledge of a witness' falsehoods, the materiality of evidence not revealed to the defense, the propriety of a closing argument."[111] This prosecutorial conduct is deemed worthy of immunity because its potential impropriety is significantly outweighed by the need to shield the prosecutor from burdensome litigation, the fear of which would prevent him from "exercising the independence of judgment required by his public trust."[112] The same cannot be said of the allegations in this case; if prosecutors were absolutely immune for the type of conduct alleged herein against Perrilloux, the "public trust" in the prosecution would, in this Court's view, be significantly undermined.

Similarly, in *Buckley v. Fitzsimmons*, the Supreme Court reiterated that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial"[113] are shielded by absolute immunity, citing as examples of such preparation "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial."[114] "Appropriate preparation" for the presentation of evidence at trial may be shielded by absolute immunity, but the Court finds that, based on the allegations as pled and considered as true at this stage in the proceedings, "appropriate preparation" is not what is alleged to have occurred here. Here, Wearry alleges, Perrilloux "picked [Ashton] up from school, drove him to Perrilloux's office, and then, without a parent present . . . intimidated him into falsely implicating Wearry in the

---

[110] *Id.* at 425.
[111] *Id.* at 409.
[112] *Id.* at 423.
[113] *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).
[114] *Id.*
50910

Walber murder."[115] These alleged actions occurred not, as in *Imbler*, during a courtroom recess at trial, which would place them much more squarely in the prosecutorial sphere. Instead, Perrilloux's alleged actions began when he went to Ashton's school in December 2001,[116] three months before Wearry's March 2002 trial.[117] Accepted as true, those alleged actions go beyond traditional prosecutorial advocacy into brazen constitutional violations that should not be entitled to absolute immunity simply because they can be laundered through the catch-all of "preparation for trial." Indeed, the *Buckley* Court cautioned against allowing prosecutors to invoke "trial preparation" to receive immunity for prosecutorial misconduct committed during the investigative phase; if that was all it took to ensure immunity, "every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial."[118]

Overall, this Court agrees with Wearry that his malicious prosecution claim "arises not from [Perrilloux's] charging decision,"[119] which would be more "intimately associated with the judicial process," but from Perrilloux's alleged fabrication of evidence during the lead-up to Wearry's conviction. Here, Wearry has successfully stated a claim that Perrilloux was acting outside of the traditional role of a prosecutor when he committed the alleged constitutional violations. Accepting the allegations as true, as the Court must on a motion under 12(b)(6), the Court concludes that Perrilloux's alleged use of intimidation and coercion to procure fabricated testimony went beyond the scope of the prosecutor's role as an advocate for the state. Therefore, the *Motion to Dismiss* shall be denied with

---

[115] Rec. Doc. No. 1, p. 9, at ¶ 64.
[116] Rec. Doc. No. 1, p. 4.
[117] Rec. Doc. No. 1, p. 6.
[118] *Buckley* at 276.
[119] Rec. Doc. No. 16, p. 7.
50910

respect to the Louisiana law malicious prosecution claim against Perrilloux in both his official and individual capacities.

## III. CONCLUSION

For the reasons stated above, Defendant Scott M. Perrilloux's *Motion to Dismiss, Pursuant to FRCP Rule 12(b)(6), For Failure to State a Claim Upon Which Relief Can Be Granted*[120] is hereby DENIED.

**IT IS SO ORDERED**.

Signed in Baton Rouge, Louisiana on June 3, 2019.

_____

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[120] Rec. Doc. No. 14.
50910